**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 08-21865-CIV-GOLD/McALILEY**

**ABC CHARTERS, INC, a Florida**
**Corporation; MARAZUL CHARTERS,**
**INC., a Florida Corporation; DAMUJI**
**SERVICES INC., a Florida Corporation;**
**WILSON INTERNATIONAL SERVICES,**
**INC., a Florida Corporation; CUBA**
**TRAVEL SERVICES, INC., a**
**California Corporation; CELIMAR**
**TRAVEL SERVICES, INC., a Florida**
**Corporation; PARADISE INTERNATIONAL,**
**INC., a Florida Corporation; COJIMAR**
**EXPRESS SERVICES, INC., a Florida**
**Corporation; CUBA EXPRESS, INC.,**
**a Florida Corporation;  CUBAMERICA**
**IMMIGRATION SERVICES CORP., a**
**Florida Corporation; HAVANA**
**EXPRESS INC., a Florida Corporation;**
**TELLEZ'S TOUR AND TRAVEL AGENCY,**
**INC., a Florida Corporation,**

     **Plaintiffs,**

**v.**

**CHARLES H. BRONSON in his official**
**capacity as Commissioner of the Florida**
**Department of Agriculture and Consumer**
**Services,**

     **Defendant.**

_____ /

**ORDER DENYING MOTION TO DISMISS AND GRANTING PRELIMINARY**
**INJUNCTION; AMENDING ORDER REGARDING PROTECTIVE ORDER**

**I. INTRODUCTION**

1

**THIS MATTER** is before the Court on Plaintiffs' Motion for Preliminary Injunction **[DE 3]** and on the Defendant's Motion to Dismiss for Lack of Jurisdiction and Lack of Standing **[DE 23, 24]**. In their complaint and motions, the Plaintiffs challenge the constitutionality of amendments to the Florida Sellers of Travel Act, Florida Statutes, Chapter 559, enacted as SB 1310 ("An Act Relating to Sellers of Travel") effective July 1, 2008 ("Travel Act Amendments")[1] and seek declaratory and injunctive relief to enjoin enforcement of the Travel Act Amendments by state officials.  The Travel Act Amendments, among other things, (1) automatically make any violation of federal law by the Plaintiffs a third-degree felony under Florida law; (2) require companies providing lawful travel related services to Cuba to post a bond in an amount ranging from $100,000 to $250,000 and allows the Defendant to use the bond to pay its own investigatory expenses without any limits to the exposure under the bond; (3) create two classes of travel providers subject to a vastly different standards (i.e. those doing business with Cuba and other "terrorist states" and those who do not do business with Cuba); and (4) require disclosure and identification by Plaintiffs of each company with whom each Plaintiff does business and make that information available to the public and Plaintiffs' competitors. Plaintiffs argue that the Travel Act Amendments violate the following provisions of the United States Constitution: the Supremacy Clause, the Foreign Affairs Power, the Foreign Commerce Clause, and the Interstate Commerce Clause. Plaintiffs also claim that the Travel Act Amendments further violate their due process rights, constitute a taking of property in violation of the Fifth

---

[1] he Travel Act Amendments were to take effect on July 1, 2008. A temporary restraining order was entered on July 1, 2008 **[DE 18]**. By agreement of the parties, a further order was entered **[DE 20]** extending the date for the preliminary injunction hearing until September 25, 2008.

Amendment, constitute a violation of the Eighth Amendment by constituting penalties that are grossly disproportionate to the severity of the offense, and violate the Right to Travel. The Defendant denies these claims and moves to dismiss for lack of jurisdiction and standing to sue. The Defendant argue  that this Court is prohibited from hearing the matter under the Eleventh Amendment and Article III of the United States Constitution **[DE 23 and 24]**.

This matter is also before the Court on Non-Party Florida House of Representatives' (the "House") Expedited Motion for a Protective Order **[DE 33]**.  As a preliminary matter, I granted the Motion on August 14, 2008 **[DE 35]**, and pursuant to the hearing held on August 27, 2008, I continued the protective order without prejudice **[DE 50]**.  In that Order, I reserved ruling on the House's Motion until the hearing on the Motion for Preliminary Injunction. For reasons set forth in this Order, Plaintiffs are permitted to renew their request to depose Representative Rivera, consistent with this Order. In the event the Plaintiffs make such a request, I will further consider the Motion for Protective Order.

Having heard oral argument on Defendant's Motion to Dismiss, and following an evidentiary hearing on the Motion for Preliminary Injunction on Friday, September 25, 2008,[2] I deny the Motion to Dismiss and grant a preliminary injunction in favor of the

---

[2]

At the evidentiary hearing, the Plaintiffs offered the affidavits of Tessie Aral (ABC Charters), Celia Leon (Celimar Travel Services), Jesus Rodriguez (Paradise International), Mario B. Romero (Cojimar Express Services), and Xiomara Levy (Xael Charters) **[DE 5, 15 and 73]**. I accepted the affidavits as the witnesses' direct examination and allowed cross-examination by Defendant Bronson. Plaintiffs also introduced Composite Exhibits 1 through 7 into evidence. Defendant Bronson offered no witnesses or exhibits in opposition, nor did Defendant file a substantive brief in response to the Plaintiffs' motion for preliminary injunction. In lieu, Defendant Bronson adopted the Amicus Curiae brief filed by the Florida House of Representatives **[DE 58]**.

Plaintiffs, for the reasons set forth in this Order.[3]  While the primary issue before me on this Preliminary Injunction hearing is Plaintiffs' likelihood of success on the merits, it is with significant concern that I note that the Travel Act Amendments-which include extraordinary expensive registration and bonding requirements, exorbitant fines and a felony conviction for those who fail to comply with the law-constitute little more  than an attempt to impose economic sanctions on travel to designated foreign governments, particularly the Republic of Cuba. But the right and power to impose such sanctions, and to establish  foreign policy, remains, under our Federal Constitution, solely within the exclusive domain of the Congress of the United States and the President,  and not within the aegis of the State of Florida under the guise of consumer protection. For reasons stated in this Order, I find a likelihood of success on the merits and convert the temporary restraining order into a preliminary injunction.  I further amend my prior Order regarding the House's Motion for Protective Order as it relates to  Representative David Rivera.

## II. THE PARTIES

The Plaintiffs are travel agencies and charter companies providing services to individuals traveling to Cuba or who wish to send humanitarian aid or family remittances to Cuba.  The Plaintiffs are licensed by the federal government to provide these travel related services to Cuba. Some of the Plaintiffs act as travel agents and sell tickets for

---

[3]

The Florida House of Representatives and the American Society of Travel Agents, Inc. have filed Amicus Curiae briefs in the cause **[DE 58 and 61]**. By a pleading filed on September 18, 2008, the United States gave notice of its potential participation pursuant to Title 28 U.S.C. § 517 which authorizes the Attorney General of the United States to attend to the interests of the United States in a suit pending in a court of the United States. The United States has requested until October 31, 2008 to communicate its views. Because I conclude that this preliminary injunction is consistent with the interest of the United States, I decline to delay these proceedings, but, in lieu, invite to the United States to comment on the matters addressed by this Order as it may desire.

flights to Cuba to individuals wishing to travel there, or send packages and humanitarian aid to families of Cuban Americans.  Some of the Plaintiffs charter aircraft to fly individuals to Cuba.  The charterers, called charter service providers, work with the travel agencies (referred to as "Travel Service Providers" or "TSP's" under federal regulations), or are themselves travel agencies,  to provide lawful passage between Cuba and the United States.

The Plaintiffs' customers live in Florida and in other States and travel here before boarding flights to Cuba.[4]  All of the Plaintiff companies  are owned by Cuban-Americans.

The Defendant, CHARLES H. BRONSON, is sued by the Plaintiffs in his official capacity as the Commissioner of the Florida Department of Agriculture and Consumer Services, a government entity established under Florida law. Mr. Bronson, as Commissioner, is charged with enforcement and implementation of the Travel Act, including the Amendments to the Travel Act.

## III. JURISDICTION

The Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to redress their claimed deprivation of rights, privileges, and immunities secured by the Constitution and the laws of the United States and under the Fourteenth Amendment to the U.S. Constitution. Plaintiffs sufficiently allege jurisdiction by claiming that the state law violates the First, Fifth, Eight Amendments and the Equal Protection and Due-Process guarantees of the Fourteenth Amendment of the U.S. Constitution and the Supremacy and Foreign Commerce Clauses. I

---

[4] Under regulations promulgated and/or administered by the Department of Homeland Security, Bureau of Customs and Border Protection, Cuba-United States travel is limited to three U.S. locations: Miami, Florida; Queens, New York; and Los Angeles, California.  8 CFR § 234.2 (a); 19 CFR § 122.153.  Thus, Cuban-Americans and U.S. citizens and others who wish to legally visit Cuba must live in Florida, California or New York or travel to and from these cities to do so.

have jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and 28 U.S.C. § 1331.

## IV. FACTUAL BACKGROUND

### A. Amendments to the Florida Sellers of Travel Act.

The amended Travel Act, *inter alia*:

a.  Requires sellers of travel to Cuba to post $100,000 or $250,000 bonds, but requires companies engaged in travel to "non-terrorist designated states" to post only a $25,000 bond even if the business that provides travel related services to Cuba has a better consumer record (F.S. § 559.929 (1)(b),(c)).

b.  Allows the state to use the bond funds to investigate any seller of travel related services to Cuba but does not allow the state to do the same for sellers of travel related services to other countries (F.S. § 559.929 (2)(b)).

c.  Gives priority on the bond funds to the state over consumers when the travel is Cuba-related but does not do the same for bonds posted by travel agencies not providing Cuba-related travel services (F.S. § 559.929 (2)(a)-(c)).

d.  Denies a seller of travel to Cuba a waiver or a reduction in their bonds in the future, despite having a good consumer record, while allowing sellers of travel to other countries to have their bond reduced or waived. (F.S. § 559.929 (5)).

e.  Bars sellers of travel services, including those selling travel to Cuba, from posting a letter of credit (which is allowed by federal law), in lieu of a bond. (F.S. § 559.929).[5]

---

[5] The elimination of the use of letters of credit and certificates of deposit in lieu of the bond required for registration applies to all Sellers of Travel. F.S. § 559.928. However the increased bond amounts apply to companies such as Plaintiffs only, not to other sellers of travel to non-designated states. F.S. § 559.929(1).

f.      Makes *any* violation of "any state or federal law" restricting or prohibiting

commerce with a designated "terrorist state", as well as violations of "this

part"…"which violation directly or indirectly pertains to an offer to sell, at

wholesale or retail, prearranged travel, tourist related services or tour-guide

services for individuals or groups directly to any terrorist state and which

originate in Florida…" (F.S. 559.937 (2)), a third degree felony.[6]  In contrast,

sellers of travel to countries other than Cuba are subject only to misdemeanor

charges for the same  violations of the Travel Act.

g.      Requires sellers of travel related services to Cuba to disclose all companies

with whom each such company does business, related to any "business or

commerce" with Cuba.  (F.S. § 559.9285 (3)(c)).

h.      In addition, the information Plaintiffs are required to disclose, all or much of

which would normally be considered protected or confidential, proprietary

customer information by the state, is expressly not to be protected as trade

secret or proprietary/confidential information by the Defendant under the

Travel Act. (F.S. § 559.9285(3)(c)).

i.      Imposes substantially higher administrative fines for any violation of state or

---

In addition, companies that do not sell travel to Cuba are eligible to have these bond requirements reduced or waived entirely, while the Travel Act Amendments expressly prohibit waiver or reduction of the bond for companies selling travel to Cuba.  F.S. § 559.929(5).

[6]

As noted in the Affidavit of Tessie Aral, even the most minor violation (i.e. a passenger's excess baggage) can result in the four-fold problem of a $10,000 civil penalty, a $10,000 administrative fine, a felony in the third degree, and the loss of any licenses. The Act provides twenty-three (23) different violations that can result in fines, penalties, and in the case of Plaintiffs, third degree felonies.  Florida statutes indicate that a felony of the third degree is punishable by a prison term of up to five years.

federal law by a seller of travel to Cuba than on sellers of travel to other countries (F.S. § 559.9355).

j.   Imposes substantially higher registration fees on sellers of travel related services to Cuba than on sellers of travel to other countries (F.S. § 559.928(2)(a)).

Most of the new Travel Act requirements apply not to travel agencies doing business in Florida or all travel related businesses, but only to businesses providing such services to individuals traveling to, or sending humanitarian aid to, families in certain designated "terrorist states," especially the Republic of Cuba. The preponderance of the evidence establishes that direct travel from Florida to any other federally designated terrorist state other than Cuba (i.e. Sudan, Syria, Iran, North Korea) is *de minimis* or non-existent. Affidavit of Maria Teresa Aral at ¶ 5. The law was aimed principally, if not solely, to travel to Cuba and not to the other terrorist states.[7] As candidly acknowledged by Representative Rivera, although the Amendments would affect travel agencies that do business with terrorist governments, "[I]n a practical sense here in Florida, the only direct flights that occur between any airport in Florida and a terrorist nations is from Miami International to Havana." Plaintiffs' Ex. B at 7 of DE 76.

Prior to the imposition of the Travel Act, there were no hearings in the state legislature, and no legislative history indicating that travelers to Cuba (or any other federally designated state) had faced any problems or were disproportionately harmed by Plaintiff travel agencies

--------

[7]

The Travel Act Amendments was sponsored by Representatives David Rivera and Eduardo Gonzalez as House Bill 671. The Statement of Sponsor acknowledged federal regulation of terrorists states and described the legislation as follows: "Just as the federal government has enacted specific legislation to regulate travel and commerce between the United States and terrorist nations, so too should Florida establish regulatory guidelines for the Florida-based operators of travel activity occurring between our state and terrorist nations." House Floor Statements, House Bill 671 Debate (April 25, 2008), Exhibits B at 2-3 of DE 76. Indeed, the sponsor of the bill argued on the floor of the Florida House of Representatives that the law was needed to stop Plaintiffs from "lining the pockets" of the Cuban government and has also stated that the legislation was justified because companies like Plaintiffs are "partners with Fidel Castro and his communist regime."

or charterers or their colleagues. To the contrary, many of the charterers and travel agencies doing business related to Cuba have been in business without incident for a substantial period of time, and had such excellent records that the State of Florida has previously waived the obligation that they post even a small bond and would continue to waive the bond requirement if these companies cease activities related in any manner to Cuba.  Aral Aff. ¶ 6(b); <u>see also</u> Affidavits of Mario Romero at ¶ 9, and Jesus Rodriguez at ¶ 9.  No record evidence was offered suggesting that there was any problem with travel service providers to Cuba from Florida that warranted legislative intrusion to protect the consumer public.[8]

### B. Effect of the Travel Act Amendments On the Plaintiffs

Many of the Plaintiffs are small family owned businesses with limited capital whose primary source of revenue is providing travel related services to customers who wish to legally travel or mail remittances to family there.  *See, e.g.*, Romero Aff. ¶ 9; Rodriguez Aff. ¶ 9; <u>see also</u> Aral Aff. ¶¶ 6, 2(c).  Although they are licensed by the federal government, many of these businesses will not be able to afford to comply with the excessive state bonding requirements and will be forced to close their doors.  Romero Aff. ¶ 12; Rodríguez Aff. ¶ 11.

Similarly, the charter service providers will be substantially affected by the Travel Act Amendments. Many businesses will be financially harmed by the loss of travel agencies that provide the client base of passengers to Cuba for whom the Plaintiff charter companies

---

[8]

The Staff Analysis of HB 671 contains no statements that the legislation was needed or designed to protect Florida consumers. The only substantive discussion in the House of Representatives was by Representative Scionti who understood the legislation to be *against* the consumer in effect. House Bill 671 Debate (April 30, 2008) at Ex. C at 6 of DE 76. While I do not reach legislative history to interpret the clear wording of the Amendments, I do note, for reasons discussed below at page 25-26 below, that the design and intent of the law is a factor that the Court may weigh in determining whether a statute's effect on foreign countries is more that incidental or indirect. Here, the design and intent of the law, at its core, is to punish companies that do business with Cuba.

arrange flight transportation.  Without the travel agencies, the charterers will face organizational, financial, and structural problems that will last months or years.  Aral Aff. ¶ 6(c).  They will also face the difficult choice of ending their businesses or continuing in business where they will be subject to felonies and potentially excessive fines for what may be minor errors of federal law (such as taking excess baggage) that would normally result, at worst, in a cautionary call or letter from federal authorities.

Plaintiffs will also be forced to disclose proprietary information to their competitors and the public under the Travel Act or suffer felony charges and severe administrative fines. F.S. §559.9285 (3)(c).  Forcing them to disgorge proprietary information will harm their businesses by requiring them to disclose all persons and entities they do business with as well as passengers who travel to Cuba. Aral Aff. ¶ 6(d).

### C. Federal Laws and Regulations Affecting Travel to Cuba and Other Designated Countries

Plaintiffs refer to several federal provisions that relate to the United State's relationship with Cuba and other designated countries.  With regard to Cuba, several laws at issue include the Cuban Democracy Act of 1992 ("CDA")[9]; the Cuban Liberty and Democratic Solidarity Act of 1996[10]; the United States Embargo of Cuba, enacted pursuant

---

[9]

22 U.S.C. § 6002 states in relevant part that: It should be the policy of the United States-
(1) to seek a peaceful transition to democracy and a resumption of economic growth in Cuba through the careful application of sanctions directed at the Castro government and support for the Cuban people; ...(7) to be prepared to reduce the sanctions in carefully calibrated ways in response to positive developments in Cuba.

22 U.S.C. § 6003 states that the President should encourage governments of countries to restrict trade with Cuba and permits the President to sanction governments that assist Cuba.

22 U.S.C. § 6005(c) provides for "strict limits on remittances to Cuba by United States persons for the purpose of financing the travel of Cubans to the United States."

[10]

This Act strengthened sanctions against Cuba and further codified the U.S. embargo on trade and financial transactions, including restrictions relating to travel and family remittances.  See 22 U.S.C. § 6021 et seq.

to the Trading With the Enemy Act ("TWEA")[11]; and the Cuban Assets Control Regulations ("CACR"). In addition, several statutes and related regulations concern the other designated countries, including the TWEA; the International Emergency Economic Powers Act ("IEEPA"); the Iran and Lybia Sanctions Act and certain regulations relating to travel to the designated countries.

## 1. <u>Federal Laws and Regulations Relating to Cuba</u>

Federal law already thoroughly regulates the field of air travel and travel by these Plaintiffs to Cuba.  Federal law places restrictions on when travel can occur [31 C.F.R. §515.560, 515.561], how often it may occur [31 C.F.R. §515.561], who may arrange travel to Cuba [31 C.F.R. §515.420, 515.415, 515.572], who may travel to Cuba [31 C.F.R. §515.560, 515.561, 515.562, 515.563, 515.564, 515.565, 515.566, 515.567], how transportation arrangements are to be made [14 C.F.R. Part 380], the amount and need for a bond and other protections for Plaintiffs' customers [14 C.F.R. Part 380].

The federal government has decided that travel to Cuba, albeit with certain restrictions, should be allowed. Plaintiffs each operate pursuant to licenses provided to them by the United States Department of Treasury.  Virtually every aspect of Plaintiffs' operations is monitored and regulated by the federal government.  Plaintiffs each operate

---

[11]

50 U.S.C. Appx. § 5(b) of the TWEA states: During the time of war, the President may, through any agency that he may designate, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise-
(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and
(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest, ...

50 U.S.C. Appx. § 5(b)(4) limits the President's power such that it does not apply to any information or informational materials, "including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds."

under a statutory and regulatory web including the Trading with the Enemy Act (50 USC §

5) and regulations promulgated and enforced by the United States Treasury Department,

Office of Foreign Assets Control, (31 C.F.R. §515 *et seq*.), as well as the Airline

Deregulation Act ("ADA") and regulations implemented and enforced by the United States

Department of Transportation ("DOT"), 49 USC § 40101, *et seq*; 14 CFR Part 380. *et seq*;

and the Department of Homeland Security.  *See, e.g.*, 8 CFR § 234.2; 19 CFR §122.153.

(a) Treasury Department, Office of Foreign Assets Control Regulation

and Oversight

Plaintiffs are authorized to operate as providers of travel related services to Cuba

pursuant to laws administered by the federal government, including by the Treasury

Department, Office of Foreign Assets Control ("OFAC")[12].  The terms of the licenses and/or

authorizations provided by OFAC to Plaintiffs are determined by OFAC and are expressly

controlled by the United States government's foreign policy goals.  "Consistent with the

foreign policy objectives of the United States, OFAC may make changes to your

authorization by requiring new procedures or prohibiting certain transactions that were

previously authorized."  Circular, 2006, "Travel, Carrier and Remittance Forwarding Service

Provider Program", Office of Foreign Assets Control (March 2006), at 6, attached as

Plaintiffs' Exhibit "C" to their Motion for Preliminary Injunction (referred to as "Exhibits 'C'").

OFAC guidelines provide:

> **The broad restrictions in the Cuban Assets Control Regulations ("CACR") in**
> **dealing with property in which Cuba or Cuban nationals have an interest are**

---

[12] The Cuban Asset Control Regulations, 31 CFR Part 515, were issued by the United States government on July 8, 1963, under the Trading with the Enemy Act.  50 U.S.C. § 5.  They are still enforced today and affect all U.S. citizens and permanent residents wherever they are located, all people and organizations physically in the United States, and all branches and subsidiaries of U.S. organizations throughout the world.  The U.S. Treasury Department's Office of Foreign Assets Control administers the Regulations.  *Cuba, What You Need To Know About the US Embargo*, Office of Foreign Assets Control, U.S. Department of Treasury, available at www.treas.gov/offices/enforcement/ofac/programs/ascii/cuba/txt.

**critical components of the United States foreign policy towards Cuba**. On the one hand the purpose of the Regulations is to limit hard currency earnings by the Cuban government and deny benefits to the Cuban economy from unauthorized remittances, commercial transactions, and tourism. **On the other hand, the Regulations support the policy objective of promoting a peaceful transition to democracy and civil society in Cuba. Licensing policy and enforcement actions, including penalties are essential components to achieving those objectives."** Service Provider Guidelines-Circular 2006, supra at 3, Appendix 1 (emphasis added), attached to Plaintiffs' Motion for Preliminary Injunction as Exhibit "C".

The OFAC Service Provider enforcement guidelines go on to provide that:

> **"OFAC's licensing process for the provision of travel, carrier and remittance forwarding services aims at establishing a regulated "Service Provider" ("SP") Community that assures that travel-related transactions and remittance forwarding are fully consistent with policy objectives and regulatory controls.** OFAC predicates the granting of SP authorizations upon an expectation that the SP will continually maintain the standard of service that is consistent with foreign policy goals within the context of an ongoing relationship between OFAC and the SP's.

> **OFAC Licensing and enforcement policy is premised on the existence of a cooperative relationship between OFAC and the SP's. Administrative actions, including licensing, provisional authorizations, oversight and review, suspension and/or revocation of authorization, monetary penalties and referral of certain cases to the Department of Justice for criminal prosecution are intended to further foreign policy goals**.

> These SP Enforcement Guidelines are intended to provide OFAC with the procedural framework of general applicability to promote consistency in enforcement actions while allowing for the appropriate exercise of OFAC discretion, consistent with the Regulations. Service Provider Enforcement Guidelines – Circular 2006, supra at 3, Appendix 1 (emphasis added). Attached hereto as Exhibit "C"

Thus, OFAC has promulgated a graduated and carefully balanced enforcement and compliance regime that provides it with maximum discretion and options required to enforce

federal law to achieve U.S. foreign policy goals in the area of relations with Cuba.  OFAC's stated intent "is to work cooperatively in carrying out this function, using an informal procedure as much as possible."  Exhibit "C", OFAC Service Provider Enforcement Guidelines - Circular 2006, at 4. For this reason, OFAC has a range of administrative actions available to it to ensure compliance by a licensed business.   OFAC administrative procedures provide for OFAC inquiry and factfinding proceedings whereby a business is given advance notice when possible of OFAC's "concerns and intended steps" and "the opportunity to comment when possible." Exhibit C, at 4.

The OFAC investigatory and enforcement regime is conservatively and carefully calibrated to allow the federal government maximum flexibility and discretion.  Plaintiffs and businesses regulated by OFAC are given the opportunity to comment "in writing or verbally on the facts at issues, on the proper analysis of the situation, and on the appropriate conclusions to draw concerning apparently inconsistent conduct and OFAC will take those comments into consideration in its evaluation."  *Id.* at 5.  OFAC also has available to it audits, additional background investigations, training, and if it finds enforcement is required, has a range of options to choose from, ranging from cautionary letters, warning letters, cease and desist orders, monetary penalties, suspension or revocation of a license, or criminal referral.  *Id.* at 6-8.

(b) United States Department of Transportation Oversight and Regulation

Plaintiffs are also regulated by the United States Department of Transportation ("DOT"). Under DOT statutes and regulations, (see 14 C.F.R. § 380.34), Plaintiffs may not accept any payments, make any reservations or issue any tickets to passengers for any public charter flights until a prospectus is filed with and approved by DOT.  As part of this process, each Plaintiff must obtain a surety bond, or a letter of credit securing payments of all passengers who are booked on the Plaintiffs' flights.  *Id.* The purpose of the bond is solely to protect the passengers and to guarantee that they will receive the transportation they booked or a refund if such transportation

14

cannot be provided.  *Id.* DOT regulations prohibit cancellation less than 10 days prior to departure and then only with special authorization from DOT.  *Id.*

Due to the foreign policy issues posed by the U.S./Cuba embargo, every prospectus for flights must be reviewed and cleared by the U.S. Department of State and OFAC before DOT approval of a flight.

Moreover, as discussed below, Plaintiffs are "air carriers" under the Airline Deregulation Act ("ADA"), codified at 49 U.S.C. § 40101 *et seq*.  The FAA expressly preempts the states from "enacting or enforcing any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier…" 49 U.S.C. § 41713.

(c) <u>Department of Homeland Security Oversight and Regulation</u>

The Department of Homeland Security, Bureau of Customs and Border Protection ("CBP"), administers regulations limiting locations of travel to and from Cuba.  Thus, travel to Cuba from the United States is limited to three locations, Miami, Florida; Queens, New York; and Los Angeles, California.  8 CFR § 234.2 (a); 19 CFR §122.153.

2. <b><u>Federal Laws and Regulations Relating to Other Designated Countries</u></b>

The Travel Act Amendments apply on their face not only to Cuba, but also to those countries that the Federal government has designated as state sponsors of terrorism, namely, Iran, North Korea, Sudan and Syria (the "other designated countries").  There is no record that Plaintiffs are injured by the application of the Travel Act Amendments to these other designated countries.  However, assuming *arguendo* that they are making a facial challenge to the constitutionality of the Travel Act Amendments as a whole, the Federal scheme governing travel and other related transactions with respect to Iran, North Korea, Sudan, and Syria will be

examined.[13]

Similar to the Federal laws and regulations that relate to Cuba, an extensive framework of Federal law and regulations exist with respect to the other designated countries, including the TWEA[14]; the International Emergency Economic Powers Act ("IEEPA")[15]; the Iran and Libya Sanctions Act[16]; and the Export Administration Act[17].

I already have noted that the OFAC has promulgated a graduated and carefully balanced enforcement and compliance regime to achieve U.S. foreign policy goals in the area of relations with Cuba. Similarly, OFAC has promulgated such a regime with respect to the other designated

---

[13]

*Amicus curiae* American Society of Travel Agents opine that, although there are no direct flights between Florida to any of the other designated countries, the Travel Act Amendments may adversely affect those businesses in Florida that offer non-direct travel to or other services such as car rentals and hotel reservations for these other designated countries.

[14]

Until June 27, 2008, when the President terminated the exercise of TWEA authorities with respect to North Korea, the TWEA provide a framework for sanctions against Cuba and North Korea. See n. 9 *supra*.

[15]

IEEPA is the statutory authority permitting the President to impose economic sanctions and other restrictions on other countries. 50 U.S.C. § 1701, entitled "[u]nusual and extraordinary threat; declaration of national emergency; exercise of Presidential authorities,"states: (a) Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

50 U.S.C. § 1702(b) states that the authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly-
(4) any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including non-scheduled air, sea, or land voyages.

[16]

The relevant sections of the Iran and Libya Sanctions Act include Pub.L. 104-172, §§ 5(a) and 9(c)(1), which obligate the President to impose sanctions on individuals making certain contributions to Iran and permits the President to waive such sanctions. Because Libya is no longer listed as a "state sponsor of terrorism" by the United States State Department, the Act no longer applies to Libya. See United States State Department List of State Sponsors of Terrorism, http:// www.state.g0v/s/ct/c14151.htm.

[17]

50 U.S.C. App. 2401 *et seq.*, and related regulations promulgated by the U.S. Department of Commerce, Bureau of Industry and Security, regulate the requirements and special controls on exports to North Korea, Iran and Syria. 15 C.F.R. §§ 746.4, 746.7, 746.9.

countries. Overall, the federal scheme that controls and restricts transactions related to countries that the federal government has designated as 'terrorist states' is comprehensive.  Similar to the regulations concerning Cuba, federal law speaks specifically to the scope and extent of travel and other related restrictions with respect to the other designated countries, which reflect the careful consideration and implementation of our country's foreign policy goals and objectives.

Currently, OFAC regulations exempt travel and transactions incidental to travel to the other designated countries from the general restrictions imposed on financial transactions involving Iran, North Korea, Sudan and Syria.  Title 31 C.F.R. § 560.210(d) of the Iranian Transactions Regulations, 31 U.S.C. § 538.212 of the Sudanese Sanctions Regulations and 31 C.F.R. § 542.206(c) of the Syrian Sanctions Regulations provide, in pertinent part, that "[t]he prohibitions contained in this part do not apply to transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and *arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages*."  (Emphasis added).

Further, 31 C.F.R. § 500.563(a) entitled "Transactions incident to travel to and within North Korea," states "[a]ll transactions of persons subject to U.S. jurisdiction, *including travel service providers*, ordinarily incident to travel to, from, and within North Korea and to maintenance within North Korea are authorized. This authorization extends to transactions with North Korean carriers and those involving group tours, payment of living expenses, the acquisition of goods in North Korea for personal use, and normal banking transactions involving currency drafts, charge, debit or credit cards, traveler's checks, or other financial instruments negotiated incident to personal travel." (Emphasis added).

In the past, OFAC regulations have imposed severe limitations on travel and related transactions involving Iran and North Korea.  For example, with respect to North Korea, prior to

1995, travel service providers, including travel agents, tour operators and carriers, could only book passage to North Korea aboard third-country carriers, 31 C.F.R. 500.563(d)(1) (1988), and no person subject to U.S. jurisdiction could arrange, promote, or facilitate group or individual tours or travel to North Korea, 31 C.F.R. 500.563(d)(2) (1988).  Viewed in the context of the comprehensive restrictions on financial transactions with the designated states, these travel and related restrictions have been designed to implement the foreign policy goals of the United States.

Finally, DOT regulations places restrictions on travel between the United States and Syria, Sudan, and North Korea.  For example, air cargo operations between the United States and Sudan are not permitted, DOT Order 98-2-5 (Jan. 16, 1998) and Syrian carriers may not take off from or land in the territory of the United States, 14 C.F.R. Pt. 91, SFAR No. 104.  On the other hand, DOT regulations specify that U.S. carriers flights may operate in North Korean airspace.  14 C.F.R. Pt. 91, SFAR No. 79.

## V.  DEFENDANT'S MOTION TO DISMISS

Defendant, Charles H. Bronson, as Commissioner of Agriculture, moves to dismiss because "the Court does not have subject matter jurisdiction and standing to sue and is prohibited from hearing this matter under the Eleventh Amendment and Article III of the United States Constitution." **[DE 23, page 1]**. He contends that the State of Florida is the real party in interest and, therefore, the Eleventh Amendment prohibits citizens from the State of Florida from suing the State in Federal Court without the State's permission (which has not been given here). He further claims that, under Section 559.935(1)(b), Florida Statutes[18], the Travel Act Amendments do not apply to the Charterer Plaintiffs (ABC Charters, Inc., Cuba Travel Services,

---

[18]

Section 559.935(1)(b), Florida Statutes provides "(1) This part does not apply to: (b) Any direct common carrier of passengers or property regulated by an agency of the Federal Government or employees of such carrier when engaged solely in the transportation business of the carrier as identified in the carrier's certificate ...."

Inc., Marazul Charters, Inc., Xael Charters, Inc., and Wilson, Charters, Inc.) and they, therefore, lack standing to sue. Based on the evidence of record to date, I disagree with these contentions and deny the motion.

Initially, it is well-established that the federal courts have jurisdiction under 28 U.S.C. § 1331 over a preemption claim seeking injunctive and declaratory relief. *See, e.g.*, *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 641-43, 122 S.Ct. 1753, 152 L. Ed. 2d 871 (2002); In *Shaw v. Delta Air Lines*, the Supreme Court held that a plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve. 463 U.S.85 at 96 n. 14, 103 S.Ct. 2890, 77 L. Ed. 2d 490 (1983) Likewise, the Fifth Circuit and other circuits have affirmed this principle holding that when a plaintiff seeks injunctive relief based on a federal statute, federal question jurisdiction clearly exits based on *Shaw*. See *Planned Parenthood of Houston and Se. Tex. v. Sanchez,* 403 F.3d 324, 331 (5th Cir. 2005)(citing *Qwest Corp. v. Santa Fe*, 380 F.3d 1258, 1264 n. 1 (10th Cir. 2004) (where preemption "is the basis for a federal claim in [plaintiff's] complaint in federal court, [*Shaw* and *Verizon*] make clear that there is federal question jurisdiction in these circumstances"); *Local Union No. 12004, United Steelworkers of Am. v. Massachusetts*, 377 F.3d 64, 74 (1st Cir.2004) ("a claim of preemption ... does constitute a federal question under § 1331."); *Ill. Ass'n of Mortgage Brokers v. Office of Banks & Real Estate*, 308 F.3d 762, 765 (7th Cir.2002) (finding that § 1331 provides jurisdiction over preemption claim); *St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of the United States Virgin Islands*, 218 F.3d 232, 241 (3d Cir.2000) (same).

With regard to the Defendant's specific contentions, I, first, conclude that the Plaintiffs' claims are not barred by the Eleventh Amendment because Plaintiffs seek to enjoin a state officer from enforcing a state law that purportedly conflicts with a federal law. The United States

Supreme Court has unambiguously have held that federal courts have the duty and authority to enjoin officers and employees of a state who act prospectively, and not nominally, in violation of the United States Constitution or federal statutes. *Ex Parte Young*, 209 U.S. 123, 161, 28 S. Ct. 441, 454, 52 L. Ed. 714 (1908) (a federal court may enjoin the attorney general of a state, whose "general duty" is to enforce state law, from proceeding to enforce a state statute which violates the federal constitution); *Miliken v. Bradley,* 433 U.S. 267, 289, 97 S. C. 2749, 2762, 53 L. Ed. 2d 745 (1977) (affirming injunctive relief requiring state officials to "conform their conduct to requirements of federal law"); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73, 116 S. Ct. 1114, 1132, 134 L. Ed. 2d 252 (1996) (reaffirming that *Ex Parte Young* allows a suit for injunction against a state official to go forward, notwithstanding the Eleventh Amendment, to end a continuing federal violation); *Verizon Md. v. Public Serv. Com'n of Md.,* 535 U.S. 635, 645, 122 S. Ct. 1753, 1760, 152 L. Ed. 2d 871 (2002).[19]

---
[19]

In *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 122 S.Ct. 1753, 152 L. Ed 2d 871 (2002), the Supreme Court addressed the interaction between 28 U.S.C. § 1331 and 47 U.S.C. § 252. Verizon brought an action in district court challenging the Maryland Public Service Commission's interpretation of an interconnection agreement earlier approved by the commission, as well as the commission's order directing compliance with its interpretation. *Id.* at 640, 122 S.Ct. 1753. The Maryland commission argued that the district court did not have subject matter jurisdiction over the action because the interpretation and enforcement order was not the type of "determination" encompassed by the judicial review provision, § 252(e)(6), and because there was no cause of action for Verizon's claim. See *id.* at 641-42, 122 S.Ct. 1753. The Supreme Court saw no need to decide whether an interpretation and enforcement decision was a "determination" within the meaning of § 252(e)(6) because, even if it were not, jurisdiction was available under § 1331: "[I]f § 252(e)(6) does not confer jurisdiction, it at least does not divest the district courts of their authority under 28 U.S.C. § 1331...." *Id.* at 642, 122 S.Ct. 1753.

In reaching this conclusion, the Supreme Court reasoned that because Verizon "seeks relief from the Commission's order on the ground that [the state] regulation is pre-empted by a federal statute," there was "no doubt" that Verizon's claim "presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Id.* As to the effect of § 252(e)(6), the Supreme Court held that § 252(e)(6) "merely makes some ... actions by state commissions reviewable in federal court," *id.* at 643, 122 S.Ct. 1753, observing that the "mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others." *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L. Ed. 2d 681 (1967)). The Supreme Court noted that § 252(e)(6) "does not establish a distinctive review mechanism," and "does not distinctively limit the substantive relief available"; instead, § 252(e)(6) reads more like "conferral of a private right of action" than a limitation on the subject matter jurisdiction of the district court. *Id.* at 644, 122 S.Ct. 1753; see also *Pac. Bell v. Pac-West Telecomm, Inc.*, 325 F.3d 1114, 1125 (9th Cir. 2003).

*In Verizon Maryland* also rejected the argument that the federal district court did not have subject matter jurisdiction because there was no private cause of action to challenge the state commission's interpretation

The *Verizon* Court explained that in determining whether the doctrine of *Ex Parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. *Id.* at 645. The Supreme Court found that plaintiffs' claim "no doubt" fell under general federal question because "Verizon seeks relief from the Commission's order 'on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail,' and its claim 'thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.'" Moreover, the Court held that Verizon's prayer for injunctive relief – that the state officials be restrained from enforcing an order in contravention of controlling federal law – clearly satisfied the "straightforward inquiry" requirement.  *Id.*

Likewise, the Eleventh Circuit has held that while state defendants sued in their official capacity for monetary damages under § 1983 are immune from suit under the Eleventh Amendment, they are not immune from claims seeking prospective declaratory or injunctive relief. See *Powell v. Barrett*, 496 F.3d 1288, 1308 & n. 27 (11th Cir. 2007) (the Eleventh Amendment does not prevent Plaintiffs from seeking prospective, injunctive relief against county sheriff); *MCI Telecomms. Corp. v. Bellsouth Telecomms., Inc.,* 298 F.3d 1269, 1272 (11th Cir. 2002);[20] *Fla. Ass'n of Rehab. Facilities v. Fla. Dep't of Health and Rehabilitative. Serv.*, 225 F.3d 1208, 1220 (11th Cir.2000) (applying doctrine of *Ex Parte Young* where plaintiffs' suit was directed against state officials for prospective injunctive relief to halt continuing violations of

---

and enforcement order. Without reaching the question whether a private cause of action existed, the Court noted that "the absence of a valid (as opposed to arguable) cause of action does not implicate subject matter jurisdiction." *Verizon Maryland*, 535 U.S. at 642-43, 122 S.Ct. 1753 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L. Ed. 2d 210 (1998)).

[20]

In *MCI*, the Eleventh Circuit relied on the Supreme Court's decision in *Verizon* and held that the Eleventh Amendment did not bar review of a Florida Public Service Commission decision in federal court where the complaint alleges an ongoing violation of federal law and seeks prospective relief.  The Court further noted that the law at issue - the Telecommunications Act - evidenced no congressional intent to foreclose jurisdiction under *Ex Parte Young.  Id.*

federal Medicaid reimbursement standards).

Here, the Plaintiffs' suit against Defendant Bronson in his official capacity for prospective injunctive and declaratory relief meet the "straightforward inquiry" requirement under *Verizon*. There is no contention, nor must there be, that Congress expressly abrogated the state's Eleventh Amendment immunity.  It is enough that Plaintiffs follow well-established case law that authorizes suits in federal court for an injunction against a state official, notwithstanding the Eleventh Amendment, to end a continuing federal law violation. The allegations of the Complaint, coupled with the evidence at preliminary injunction, establish that there is immediate expectation an ongoing violation of federal law by a state official charged with its enforcement unless injunctive relief is granted.

Second, Defendant Bronson's argument, that the State of Florida is the "real party in interest" fails because the amended Florida Sellers of Travel Act expressly confers enforcement and implementation authority upon the Florida Department of Agriculture. This simply is not a case where the action is *nominally* against individual state officers, and, instead, the state is the real, substantial party in interest. Rather, in this case, the Department *is* the agency authorized to collect registration fees, enforce bonds and impose penalties for non-compliance of the law. At oral argument, the Defendant conceded this point. In his official capacity as Commissioner of the Florida Department of Agriculture and Consumer Services, Defendant Bronson has the authority to execute the powers, duties, and functions vested in the Department. Section 20.05(1)(a), Florida Statutes. Accordingly, he has the requisite connection with enforcement of the act to be a party in this suit. See *Ex Parte Young*, 209 U.S. at 157 ("The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specifically created by the act itself, is not material so long as it exists.").  See *also Luckey v. Harris*, 860 F.2d 1012, 1015-16 (11th Cir. 1988) ("All that is required is that the official be responsible for the challenged

action.")[21]

Third, the record, including the exhibits to the Complaint and affidavits, establish, at this juncture, that the charterer service provider ("CSP") Plaintiffs have standing to sue to the extent they are not just charter companies.[22]   Plaintiffs contend that CSPs, such as ABC Charters,

---

[21] *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984), cited by the Defendant for the proposition that the Eleventh Amendment bars a suit against state officials when the State is the real, substantial party in interest, is not helpful because it dealt with state officials violating state law, not federal law.  Moreover, *Pennhurst* recognized that the *Ex Parte Young* exception applies in a suit challenging the federal constitutionality of a state official's action.  *Id.* at 103.  Finally, Defendant has not shown any persuasive authority that in the context of this case, the state of Florida should be considered the real party in interest.

The supplemental authorities submitted by Defendant **[DE 79]**, *AT&T Commc'ns v. BellSouth Telecomm.*, 238 F.3d 636 (5th Cir. 2001) and *MCI Telecomm. Corp. v. Bell Atlantic-Pa.*, 271 F.3d 491 (3d Cir. 2001) are also not helpful.  In both cases, the *Ex Parte Young* exception was held to apply to permit suit against public utility commissioners for continuing violations of the Telecommunications Act of 1996.  Indeed, in both cases, the Court noted that a narrow interpretation of the *Ex Parte Young* doctrine articulated by Justice Kennedy in his majority opinion in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S Ct. 2028, 138 L. Ed. 2d 438 (1997) was supported by only one other Justice and is *not* the controlling standard.  *AT&T Commc'ns*, 238 F.3d at 648-49; *MCI Telecomm. Corp.*, 271 F.3d at 507-08.

[22] The analytical framework for resolving standing issues requires consideration of both "constitutional" and "prudential" requirements for standing. *Warth v. Seldin*, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 45 L. Ed. 2d 343 (1975); *Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir.1994) (en banc). "The constitutional requirements derive from Article III's limitation of federal jurisdiction to situations where a justiciable 'case or controversy' exists between the litigants." *Harris,* 20 F.3d at 1121 (citing *Warth*, 422 U.S. at 498, 95 S.Ct. 2197). The Eleventh Circuit has explained that to meet the requirements of Article III, "the plaintiff must show: (1) that he has suffered an actual or threatened injury, (2) that the injury is fairly traceable to the challenged conduct of the defendant, and (3) that the injury is likely to be redressed by a favorable ruling." *Id.* (citing *Saladin v. Milledgeville*, 812 F.2d 687, 690 (11th Cir.1987)). If a plaintiff cannot satisfy these constitutional standing requirements, the case lies outside the authority given to the federal courts by Article III and must be dismissed. *Id.*

In addition to the constitutional requirements of Article III, the Supreme Court has also instructed courts to consider certain prudential principles when weighing whether judicial restraint requires the dismissal of a party's claims. *Warth*, 422 U.S. at 499-500, 95 S.Ct. 2197. The Eleventh Circuit has summarized these prudential considerations as: 1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue; 2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and 3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties. *Bischoff v. Osceola County*, 222 F.3d 874, 883 (11th Cir. 2000); *Harris*, 20 F.3d at 1121 (quoting *Saladin*, 812 F.2d at 690).

Plaintiffs have sufficiently established, at this juncture, both constitutional and prudential standing in that the Charterers, as also licensed travel service providers, have allegedly suffered an injury in fact fairly traceable to the Defendant.  Alternatively, even without being licensed travel service providers, CSPs depend on ticket sales from TSPs who are subject to the amended Travel Act. Aral Aff. ¶ 6(d). If the TSPs are forced to close due to excessive fees or threat of severe civil and criminal penalties, the CSPs would be prevented from

remain subject to the amended Travel Act because it also is a licensed travel service provider ("TSP"), in that it sells tickets to passengers directly and takes reservations from travel agencies for flights to Cuba, Aral Aff., ¶ 12, and travel agencies must be licensed as Travel Service Providers. Plaintiffs represent that all Plaintiff CSPs in this action are also licensed by OFAC as TSPs and have all been required in the past to post a bond with the Florida Department of Agriculture.[23]

For all of these reasons, the Defendant's motion to dismiss is denied. Accordingly, I now turn to the Motion for Preliminary Injunction.

## VI.  STANDARD FOR PRELIMINARY INJUNCTION

A preliminary injunction is an "extraordinary and drastic remedy" that should be granted only if Plaintiffs clearly established their "burden of persuasion." *McDonalds Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir.1998). Plaintiffs must establish: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) that the threatened injury outweighs whatever damage the injunction may cause; and (4) that if issued, the injunction would not be adverse to the public interest.  *Charles H. Wesley Educ. Found., Inc. v. Cox,* 408 F.3d 1349, 1354 (11th Cir. 2005); *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir. 1983); *Miami Light Project v. Miami-Dade County,* 97 F.Supp.2d 1174, 1178 (S.D.Fla. 2000). Of these four requisites the first factor, establishing a substantial likelihood of success on the merits, is most important and the one discussed at length here.

---

continuing in a contractual relationship with those TSPs, which could be fatal to the CSPs' businesses. Aral Aff. ¶6(c)

[23]

Even though the amended Travel Act does not apply to those companies who are solely CSPs, courts have routinely found that a business has standing to bring a § 1983 action against state officials who are harming its business by discriminating against its customers. *Young Apartments, Inc. v. Town of Jupiter,* 529 F.3d 1027, 1039 (11th Cir. 2008)

## VII. APPLICATION OF THE STANDARD

### A. Plaintiffs Have Demonstrated a Likelihood of Success on the Merits

In ruling on the Plaintiffs' Motion for Preliminary Injunction, I must examine whether the Travel Act Amendments are likely to be found illegal or unconstitutional under any of the Plaintiffs' challenges. If I conclude that the Plaintiffs have met their burden on certain of their claims, I need not proceed to address their remaining claims at this time. *Miami Light Project v. Dade County,* 97 F.Supp.3d 1174, 1179 (S.D. Fla. 2000)(finding a substantial likelihood of success based on foreign affairs provision, foreign commerce clause and supremacy clause and not reaching First Amendment and equal protection clause issues). Given that limitation, I conclude that the Travel Act Amendments will likely be found unconstitutional under the Foreign Affairs Provisions, the Supremacy Clause, the Foreign Commerce Clause and the Interstate Commerce Clause.  Therefore, I do not reach the Plaintiffs' remaining claims, although I am prepared to do so on preliminary injunction if later deemed necessary upon further appellate review.

### 1. The Foreign Affairs Power

As recently well-analyzed in *Faculty Senate of Florida International University v. Roberts,* 2008 WL 405166 (S.D. Fla August 29, 2008)(finding in favor of plaintiffs on their  challenge to constitutionality of Florida's Travel Act restricting state universities from spending both state and "nonstate" funds on activities related to travel to a "terrorist state"), "'[t]he exercise of the federal executive authority means that state law must give way where ... there is evidence of clear conflict between the policies adopted by the two." *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421, 123 S.Ct. 2374, 156 L. Ed. 2d 376 (2003); see also *Zschernig v. Miller*, 389 U.S. 429, 442, 88 S.Ct. 664, 19 L. Ed. 2d 683 (1968)(Stewart, J. concurring) (citing Hines v. Davidowitz, 312 U.S. 52, 63, 61 S.Ct. 399, 85 L. Ed. 581 (1941) (stating that "[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of

the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference")). For a state statute to encroach on the federal foreign affairs power, it must have more than "some incidental or indirect effect in foreign countries." *Zschernig*, 389 U.S. at 434-35. The First Circuit has articulated a five factor test (the "*Natsios* Factors") for determining when a statute's effect on foreign countries is more than "incidental or indirect." *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 53 (1st Cir.1999) ("Natsios ").[24] Those five factors that a court must weigh are: (1) the design and intent of the law; (2) the amount of purchasing power the law affected; (3) the possibility of other states following the example; (4) the protests lodged by other foreign countries; and (5) the differences between the state and federal approaches. *Id.*

### (a) The Design And Intent Of The Law

The Travel Act Amendments' treatment of non-Cuban terrorist states stands in distinct contrast to the federal government's treatment of Cuba. The federal government treats persons selling travel to all other terrorist states in the same manner as a person selling travel to a non-terrorist state. There are no regulations under the Iranian, Syrian, North Korean, or Sudanese transaction regulations that *currently* regulate the sellers of travel to those countries.

The fact that the Travel Act Amendments primarily apply to Cuba (as compared to other "terrorist states" (where travel from Florida is *deminimus* or non-existent) and the burdens and penalties imposed by the Amendments are structured to end or seriously hamper federally licensed travel from Florida to Cuba by those legally entitled to travel to that country, demonstrates that the "design and intent" of the law is more than just a state consumer protection decision (especially since on their face the benefit of the Amendments inure to the state and not the consumer), but also a political statement of condemnation on the designated countries, particularly the Republic of Cuba.  See *Facualty Senate of Florida International*

---

[24]

In absence of Eleventh Circuit precedent, I conclude that it is likely that it would adopt and apply the *Natsios* test.

*University*, 2008 WL 4056166, * 10 (finding that the fact the Act restricts the use of "non-state" funds, as well as state funds used to administer non-state funds, demonstrates the law is more than just a state spending decision, but a political statement ); *Miami Light Project*, 97 F.Supp.2d at 1180 (stating that because the "stated purpose of [a county ordinance was] to protest and condemn Cuba's totalitarian regime," it was outside the scope of the county's power); see also *Tayyari v. N.M. State Univ.*, 495 F.Supp. 1365, 1379-80 (N.M.1980) (holding that a university regulation entitled the "Substitute Motion," which denied admission or readmission Iranian students to New Mexico State University, was unconstitutional because the "true purpose in enacting the Substitute Motion was to make a political statement.").

Indeed, the Sponsor of the Travel Act Amendments is on record that the law was needed to stop Plaintiffs from "lining the pockets" of the Cuban government, that the legislation was justified because the companies like Plaintiffs are "partners with Fidel Castro and his communist regime," that the Act is to prevent "his constituents' tax money from underwriting Fidel Castro's regime" (see Exhibits A and B to Plaintiffs Motion for Preliminary Injunction), and that "[a]ny travel to a terrorist country necessarily subsidizes that terrorist regime."

The fact that the Sponsor's criticism of Cuba's oppressive regime is well-founded is simply not the point. What is the point is that the Florida Legislature may not impose exorbitant financial requirements (unrelated to consumer protection needs) and excessive penalties, evidencing the "sanctioning" nature of the Travel Act Amendments, in a desire to preclude travel to Cuba (and other designated countries) without running afoul of the United States Constitution.

### (b) The Economic Impact of the Act

Under the federal regulations, the Plaintiffs, as licensed travel agents, are the only agents allowed under federal law to transport people from the United States to Cuba. Interruption of the limited air transportation between Florida and Cuba will further exacerbate the limited visitation rights of Cuban-Americans who have family members remaining on the island. These visitation

rights are already curtailed by federal regulations, which places restrictions on how often Cuban-Americans can visit their family members.

Additionally, the evidence at the preliminary injunction hearing establishes that many of the Plaintiffs are small owned businesses with limited capital whose primary source of revenue is providing travel related services to customers who wish to legally travel or mail remittances to family there. Although they are licensed by the federal government, many of these businesses will not be able to afford to comply with the extraordinarily high bonding requirements and will be forced to close their doors. Nothing in the record supports that higher bond requirements protect the consumer. In fact, given the Amendment scheme, the consumer may be the last person to obtain the proceeds on a state bond under the Travel Act because the Amendments give priority on the bond funds to the state over consumers. F.S. Ch. 559.929(2)(a)-(c).

Similarly, the preponderance of the evidence at the preliminary injunction hearing further establishes that the charter service providers will suffer substantial economic impact. Many businesses will be financially harmed by the loss of travel agencies that provide the client base of passengers to Cuba for whom the Plaintiff charterer companies arrange flight transportation. Without the travel agencies, the charterers will face organizational, financial, and structural problems that could last months or years. While the exact amount of money impacting the designated countries, primarily Cuba, is not totally quantified, the impact is more than "incidental or indirect" considering the nature and extent of legally travel to Cuba occurring through the Travel Providers and Charter Service Providers to date. See Springfield Rare Coin Galleries v. Johnson, 115 Ill.2d 221, 236, 104 Ill. Dec. 743, 750, 503 N.E.2d 300, 307 (Ill.1986) (holding that "regulations which amount to embargoes or boycotts are outside the realm of permissible State activity").

The ability of this Nation to choose between a range of policy options in developing its foreign relations with Cuba and the designated countries is impaired by the existence of the

"sanction" that the Travel Act Amendments imposes on the designated countries. The federal government cannot be hampered or impaired from removing, or modifying the restrictions at issue to fit changing conditions. See *id*. Thus, the second factor also indicates that the Travel Act Amendments have more than an "incidental or indirect" impact on foreign affairs.

### (c) The Possibility of Other States Following the Example

The third *Natsios* Factor, influence on other states, also militates against the Travel Act Amendments restriction on those who provide travel related services to Cuba and, as charterers, provide lawful passage between Cuba and the United States.  In concluding that the third *Natsios* Factor weighed against the Burma Statute, the First Circuit stated that "the effects of the law [Burma Statute] may well be magnified should Massachusetts prove to be a bellwether for other states (and other governments[.] )" *Natsios*, 181 F.3d at 53. Similarly, Judge Moreno concluded that "Miami-Dade County, like Massachusetts, may be a bellwether for other states." *Miami Light Project*, 97 F.Supp.2d at 1180. Likewise, here, the effects of the Travel Act Amendments enacted by the Nation's fourth largest state, which curtail the opportunity for lawful travel with the designated countries, if replicated by other states or local governments, including New York and California, would be magnified to a great degree that all permissible travel from Florida, New York and California to Cuba could effectively end.

### (d) The Differences Between The State And Federal Approaches

Finally, Plaintiffs' argument that the Travel Act Amendments mark a departure from foreign policy towards the designated countries is also persuasive. A discussion of the interplay between the Travel Act Amendments and federal statutes relating to the designated countries is addressed more fully below in the discussion of preemption. Based on the preponderance of the evidence at preliminary injunction, the Travel Act Amendments restrictions on federally licensed travel from Florida to Cuba, as well as the other designated countries, constitute more than an "incidental or indirect" effect on foreign affairs and therefore infringes the federal

government's foreign affairs power.

## 2. Preemption/Supremacy Clause

The Supremacy Clause of the United States Constitution establishes federal law as the "supreme law of the land, and invalidates state laws that interfere with or are contrary to federal law." *Lozano v. City of Hazleton*, 496 F. Supp. 2d 477, 518 (M.D. Pa. 2007) (citing *Gibbons v. Ogden*, 22 U.S. 1, 9, 6 L.Ed 23 (1824)).  This invalidation is termed federal preemption.  *Olde Discount Corp. v. Tipman*, 1 F. 3d 202 (3rd Cir. 1993); Hazleton, *supra* at 517; U.S. CONST., art. VI, cl. 2.  The Plaintiffs argue that federal law preempts the Travel Act Amendments because these Amendments conflict with federal laws and other regulations concerning the United States' relations with the designated countries. Additionally, the Plaintiffs contend that the Congress has "occupied the field" and "closed off this area to state regulations." In furtherance of these arguments, the Plaintiffs rely on theories of "express preemption," "conflict preemption," and "field preemption." See *This That And Other Tobacco, Inc. v. Cobb County,* 285 F.3d 1319, 1322-23 (11th Cir. 2002) (explaining these latter two preemption theories, as well as express preemption). See also *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n. 6, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000) (noting that preemption theories are not "rigidly distinct").

As discussed at length in *Faculty Senate of Florida International University, 2008 WL 4056166, *12-13, a* fundamental principle arising from the Second Clause of Article VI of the Constitution is that Congress has the power to preempt state law. See *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73, 120 S.Ct. 2288, 147 L. Ed. 2d 352 (2000) (citations omitted). Even without an express provision for preemption, state law must yield to a congressional act in at least two circumstances: (1) when Congress intends federal law to "occupy the field;" and (2) even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute. *Id.* Federal law preempts state law where it is impossible for a private party to comply simultaneously with both state and federal

30

law, or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citing *Hines,* 312 U.S. at 67). Defining what is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects. *Id.* The *Crosby* Court stated specifically that " For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished-if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect-the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.* at 373 (citing *Savage v. Jones,* 225 U.S. 501, 533, 32 S. Ct. 715, 56 L. Ed. 1182 (1912)).

In this case, there is a strong likelihood that the Florida Sellers of Travel Act is both expressly and impliedly preempted by federal law.

### (a) <u>Express Preemption</u>

The Airline Deregulation Act prohibits the state of Florida, or a political subdivision of the state, from enacting or enforcing any law, regulation or other provision "relating" to a price, a route, or a service of any air carrier authorized to provide interstate[25] air transportation.  49 USC § 41713 (b)(1).  49 USC § 41713 (b)(1) provides in relevant part as follows:

> Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law *related* to a price, route, or service of an air carrier that may provide air transportation under this subpart.  49 USC § 41713 (b)(1) (emphasis added).

---

[25] An "air carrier" is defined as an entity which provides "air transportation," 49 USC § 40102 (a)(2), which is defined as **foreign** air transportation, interstate air transportation, or the transportation of mail by aircraft." 49 USC § 40102 (a)(5) (emphasis added).  Plaintiffs clearly directly or indirectly provide foreign air transportation.

Plaintiffs are "air carriers" covered by this language.  "Air Carrier" under the ADA is defined as "a citizen of the United States undertaking any means, directly or indirectly, to provide air transportation." 49 USC § 40102(a)(2).  Travel agents, tour operations, shipping and charterers and the like are "indirect air carriers" covered by the ADA. 14 CFR § 380.2; *Illinois Corporate Travel, Inc., v. American Airlines, Inc.,* 682 F.Supp. 378, 380 (N.D. Ill. 1988)(preemption upheld because state law allowing travel agents to charge lower rates could "potentially cause the rates for airline tickets in Illinois to differ from those available in other states"); *Arkin v. Trans Int'l*, 568 F. Supp. 11, 13 (E.D.N.Y. 1982) (finding that travel agents and tour operators are indirect air carriers); *Monarch Travel Servs., Inc. v. Associated Cultural Clubs, Inc.*, 466 F.2d 552, 554 (1972) <u>cert. denied</u>, 410 U.S. 967, 93 S. Ct. 1444 (1973) (holding that organizations arranging charter flights operate very much like a carrier and should be treated as a carrier, regardless of the label it applies to its business); *Ry. Express Agency v. C.A.B.*, 345 F. 2d. 445, 448 (1965), <u>cert denied</u>, 86 S. Ct. 162 (1966) (finding that one who holds out to the public that it will undertake to transport property by air is an indirect air carrier).

ADA preemption generally encompasses three types of state laws.  Those which: (1) specifically regulate airlines; (2) indirectly regulate rates, routes or services; and (3) have a significant effect on rates, routes or services, even though they are laws of general effect.  Thus, a state law claim, whether by a private individual or government entity, will be preempted if it involves the enactment or enforcement of the state law.  If the law has a connection with or relation to airline prices, routes or services even indirectly, it is preempted by the federal law.  *Morales v. Transworld Airlines, Inc.*, 504 U.S. 374, 388-89, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992).

In *Morales* the Supreme Court noted that this preemption provision is broad and will be

32

construed to preempt any state law or state enforcement action "having a connection with or reference to" airline rates, routes, or services.  *Morales*, 504 U.S. at 388-89 (airlines sued to enjoin state attorneys general from enforcing state deceptive practices law against airline advertising.  Trial court entered a preliminary injunction on grounds of preemption by 49 U.S.C. § 41713, the Court of Appeals and Supreme Court affirmed, finding state guidelines regarding airline fair advertising were expressly preempted by Airline Deregulation Act.)  The Supreme Court stated that the ordinary meaning of the term "relating to" in ADA preemption provision is "a broad one," and the words "thus express a broad preemptive purpose."  The Court found that it was "clear as an economic matter that the [state regulations] would have a forbidden effect upon fares" and that compelled disclosures and advertising restrictions would have a significant impact on the airlines' ability to market their product and upon the fares they charge.  *Id.* at 388. The Court also found that the express preemption provision of the federal statute "relating to" rates, routes or services "displaced all state laws that fall within its sphere, even including state laws that are consistent with [the federal laws] substantive requirements".  *Id.* at 387.

While the Travel Act Amendments directly affects Plaintiffs as "indirect" air carriers, for a state law to be preempted, those amendments need not directly regulate an air carrier. Regulation of other individuals or entities, if such regulation will have an effect on price, route or service of a direct or indirect air carrier, is preempted.  *Huntleigh Corp. v. La. State Bd. of Private Security Examiners*, 906 F. Supp. 357, 62 (M.D. La. 1995) (Louisiana law governing registration and training of private security officers performing pre-departure screening at airports affected "services" of air carriers and was therefore preempted by the express preemption provisions of the Airline Deregulation Act.  Federal scheme essentially created uniform training standards and uniform minimum qualifications for employees or agents of

airlines who perform pre-departure screening and allowing states to prescribe such qualifications and training would have frustrated uniformity of training standards and employee qualifications, thus conflicting with federal scheme); see also, *Branche v. Airtran Airways Inc.*, 342 F.3d 1248, 1254 (11th Cir. 2003) (finding that so long as state law action has connection with airline prices, routes, or services, preemption of such law under Airline Deregulation Act is mandated regardless of whether the state law specifically addresses the airline industry); *Marlow v. AMR Services Corp.*, 870 F. Supp. 295, 298 (D. Haw. 1994) (State enforcement actions which have a connection with or reference to airline rates, routes or services are preempted by the Airline Deregulation Act.  The laws do not have to actually prescribe rates, routes or service or be specifically addressed to the airline industry or be inconsistent with federal law); *In Re American Airlines Inc. Privacy Litigation*, 370 F.Supp. 2d 552, 561 (N.D. Tex. 2005) (laws of general applicability may be preempted by Airline Deregulation Act and need not actually prescribe airline prices, routes, or services.  Thus, preemption under ADA is not limited to claims bought directly against air carriers); *American Airlines Inc. v. Wollintz*, 513 U.S. 219, 226,115 S. Ct 817, 130 L. Ed. 2d 715 (1995) (Airline Deregulation Act preemption of state regulation does not turn on whether the matter is "essential" or "unessential").

The Supreme Court recently ruled that the preemption provision of the Federal Aviation Administration and Authorization Act ("FAAAA"), which states that "a State...may not enact or enforce a law...related to a price, route, or service of any motor carrier...with respect to the transportation of property," expressly preempted certain provisions of Maine's Tobacco Delivery Law requiring licensed tobacco shippers (not carriers) to utilize a delivery service that verified the legal age of the buyer.  *Rowe v. N.H. Motor Transport Ass'n*, 128 S. Ct. 989, 995, 169 L. Ed. 2d 933 (2008).  The Court's preemption analysis relied on the fact that FAAAA provision

34

was copied from the preemption provision of the ADA.  Following the *Morales* framework, the

Court held that Maine's law was preempted because it affected motor carrier service providers

that made up a substantial portion of delivery services, and although it acted directly against

shippers rather than carriers, it would have had an adverse impact on carriers by effectively

requiring them to offer a system of services not otherwise provided or required by federal law.

*Id.*

In the instant case, the Travel Act Amendments are "related to" (and will certainly affect)

the routes, prices or services Plaintiffs provide.[26] Fewer services at a higher rate will be the

inevitable (and intended) result of the Travel Act Amendments as the number of travel agencies

shrink, because they cannot afford to post a $100,00.00 to $250,000.00 bond, or as their

increased costs are passed on to their customers. Similarly, the number of charterers will

become smaller as they lose their economic base supplied by travel agencies, they are forced

to constantly replace their $100,000.00 or $250,000.00 bond used to pay the state's

investigative costs, or they simply do not wish to continue operating under a regime where the

slightest error or dispute with a consumer will result in a felony prosecution and onerous

administrative penalties and fines.  <u>See generally</u> Aral Affidavit.

The fact that the Travel Act Amendments may be proffered by the Defendant as a

---

[26]

The House Amicus argues there must be an evidentiary showing that higher travel agent fees passed on to the consumer result in higher "airline rates." H.AB at 4. But, there is no requirement that airline rates be affected; rather, the statute includes "price, route, or service of an air carrier," which include regulations related to price, route or service of ticket agents. There is a broad definition accorded the words "related to" in the statute. *Morlates v. Trans World Airlines,* 504 U.S. 374, 383 (1992)("The ordinary meaning of these words is a broad one- ' to stand in some relation; have bearing or concern; to pertain; refer, to bring into association with or connection with'-and the words thus express a broad preemptive purposes"); *Rowe v. N.H. Motor Transport Ass'n,* 128 S.Ct. 989, 995 (2008)(the regulation of shippers, and not carriers, was sufficient for preemption and describing *Morales* as supporting preemption even if the state law's effect on rates, routes or services is only indirect). Here, the imposition of high bonds; high registration fees, pervasive reporting requirements (including the release of trade secrets) and the risk of criminal felony charges, is, on its face, related to the "service" of tour operators and ticket agents, as well as their "price" and "routes."

"consumer protection statute"[27] does not provide a defense to preemption.  Indeed, courts routinely hold that state consumer protection and deceptive practices, laws and regulations are expressly preempted by 49 U.S.C. § 41713(b)(1).  *Morales, supra*; see also e.g. *Am. Airlines v. Roland*, 513 US. 219, 228, 115 S.Ct. 817, 130 L. Ed. 2d 715 (1995) (Illinois' Consumer Fraud and Deceptive Business Practices Act preempted by ADA); *Trujillo v. Am. Airlines*, 938 F. Supp 392, 394 (N.D. Tex 1995) (claims under Texas Deceptive Trade Practices Act preempted by ADA).

### (b) Conflict Preemption

Conflict preemption "arises in two circumstances: when it is impossible to comply with both federal and state law and when state law stands as an obstacle to achieving the objectives of the federal law." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1122 (11th Cir. 2004). What is a sufficient obstacle is determined by examining the federal statute and identifying its purpose and intended effects. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S. Ct. 2288, 2294, 147 L. Ed. 2d 352 (2000).[28]

In *Nat'l Foreign Trade Conference v. Natsios*, 181 F. 3d 38 (1st Cir. 1999), the First Circuit found that Massachusetts, through its Burma Law, was attempting to regulate the same

---

[27] Moreover, the United States Department of Transportation already regulates Plaintiffs and is authorized to investigate any deceptive trade practices.  DOT requires Plaintiffs to post a bond for the protection of consumers.  14 CFR 380.34.  Under the Travel Act, any aggrieved consumers will be last in line for compensation against a bond posted by a Plaintiff.  F.S. 559.929 (2)(a)-(d).  Moreover, many of the Plaintiffs have had no customer complaints for so long that the state has waived the bond requirements. Romero Aff. ¶ 8; Rodriguez Aff. ¶ 8.

[28] The Supreme Court in *Crosby* stated: "[T]he conflicts are not rendered irrelevant by the State's argument that there is no real conflict between the statutes because they share the same goals and because some companies may comply with both sets of restrictions... The fact of a common end hardly neutralizes conflicting means (citation omitted) and the fact that some companies may be able to comply with both sets of sanctions does not mean that the state Act is not at odds with achievement of the federal decision about the right degree of pressure to employ ... Conflict is imminent when two separate remedies are brought to bear on the same activity." 530 U.S. at 379-80.

conduct – trade with Burma – addressed by the Federal Burma Law, but was doing so by imposing restrictions different in scope and kind from the federal law, wherein some actions lawful under federal law would be unlawful under the state statute. *Natsios*, 181 F.3d at 75. The First Circuit, and later the Supreme Court, determined that the Massachusetts law was invalid under the Supremacy Clause because of conflict preemption. *Crosby*, 530 U.S. at 388. [9]2

The existence of a common goal "hardly neutralizes the conflicting means," and the fact that some companies may be able to comply with both sets of sanctions does not mean that the state Act is not at odds with achievement of the federal decision about the right degree of pressure to employ. *Id.* at 379-80.   Conflict is "imminent when two separate remedies are brought to bear on the same activity." *Id.* at 380 (quoting *Wis. Dept of Indus. v. Gould, Inc.*, 475 U.S. 282, 286, 106 S. Ct. 1057, 1061, 89 L. Ed. 2d 223 (1986)). The inconsistency of sanctions "undermines the congressional calibration of force." *Id.* at 380.

In affirming the First Circuit's decision, the Supreme Court in *Crosby* found that Congress intended the President to have sole authority over the regulation of foreign relations with Burma, and thus the Massachusetts Burma Law was preempted by the federal law:

> "It is simply implausible that Congress would have gone to such lengths to empower the President [with regulating foreign relations with Burma] if it had been willing to compromise his effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of discretionary Presidential action."

*Crosby*, 530 U.S. at 376. To illustrate the effect of the Massachusetts Burma Law, the Court stated that "the state Act reduces the value of the [bargaining] chips created by the federal statute" – and thus 'stands as an obstacle to the accomplishment and execution of the full

---

[9]2 The *Crosby* court found that conflict preemption grounds alone were sufficient to affirm *Natsios*, and therefore felt it unnecessary to analyze the remaining arguments raised in the court of appeals (field preemption, foreign affairs, and foreign commerce clause).

purposes and objectives of Congress.'" *Id.* at 377 (citing *Dames & Moore v. Regan*, 453 U.S. 654, 673, 101 S. Ct. 2972, 69 L. Ed. 2d 918 (1981) and *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404, 85 L. Ed. 581 (1941)).

The Florida Sellers of Travel Act creates the same conflicts as the Massachusetts Burma Law. The federal government, through the passage of the Trading With the Enemy Act, has made it clear that it has exclusive power to regulate any involvement with Cuba. The federal law already places restrictions on sellers of travel, including regulations as to who can travel to Cuba, when they can travel, how often they can travel, who can arrange travel to Cuba, and how those transportation arrangements are to be made. Bond requirements already exist for sellers of travel.[30]

The state law, however, seeks to regulate all of these matters. The Travel Act Amendments require Plaintiffs to post a bond in the amount of $100,000.00 to $250,000.00. The Travel Act Amendment bond requirements are in stark contrast to the federal bond requirements because unlike the federal bonding requirements the state bonds may or may not be used to protect the traveling public (as the state may seize the funds for investigative costs) and may not be placed by allowing the posting of a letter of credit or other vehicle. 14 C.F.R.

---

[30] The House Amicus argues that "because the goals" of the federal regulation and the state Act "are not conflicting," presumption does not apply. H. A.B. at 5. But even assuming the "goals" are not conflicting, it is the State law's requirement (placing high penalties and third degree felonies on travel agents) that violate *federal* law in travel to Cuba or other terrorist states. The Travel Act Amendments directly conflict with the subtle, calibrated set of sanctions provided by the federal government (ranging from simply documenting a federal violation to warning letters and other sanctions on travel agents) that are designed to have travel agencies disclose their violations for federal enforcement purposes. The State's constraints, as included in the Travel Act Amendments, "stand as obstacles" to the federal government's decision to liberalize or lessen travel to a terrorist designated state in line with foreign policy and national concerns. The clear facial effect is to pose an obstacle by imposing higher burdens on travel providers to terrorist-designated countries when the federal government imposes no restrictions on who may sell travel to those countries. Likewise, the decision to fine, punish, or otherwise de-license a travel agent selling travel to Cuba is a matter of subtle and calibrated federal enforcement guidelines that take into consideration the foreign policy and national security objectives of that travel program.

§380.34.

In addition, the State imposes felony charges against Plaintiffs for violation of the same federal law that the federal government, in the interests of balancing foreign policy considerations against enforcement, may impose no penalty.  For example, it is clearly a violation of federal regulations for a person who has traveled to Cuba to visit his relatives if he traveled without first obtaining a license or traveled more than one time in three years. 31 C.F.R. §515.561. If a travel service provider erroneously allows a Cuban-American to visit his relatives two times in three years, he or she has violated OFAC regulations and therefore violated federal law. OFAC, in the interest of balancing enforcement with maintaining travel to Cuba, may impose no penalty except a warning letter or telephone call. Under the Travel Act, it is a third degree felony because any violation of federal law is punishable by a third degree felony.  F.S. Ch. 559.937 (2).  To place additional restrictions on these sellers of travel, which would regulate the exact same conduct, would create inherent conflicts.

Even if the Travel Act amendments could be viewed as having a common goal with the myriad of federal laws and regulations cited above, it is still preempted by federal law. As the Supreme Court explained in *Crosby*, supra at 379, the existence of a common goal "hardly neutralizes [the] conflicting means."  Moreover, the inconsistency in the sanctions undermines Congress' intent and motives underlying the embargo against Cuba and all the regulations that relate to it.

### (c) Field Preemption

When Congress intends federal law to "occupy the field," state law in that area is preempted.  See *United States v. Locke*, 529 U.S. 89, 115, 120 S. Ct. 1135, 1151, 146 L. Ed 2d 69 (2000) (citing *Charleston & W. Carolina R. Co. v. Varnville Furniture Co.*, 237 U.S. 597, 604,

35 S. Ct. 715, 717, 59 L. Ed. 1137 (1915)). Field preemption occurs when federal regulation in a field is so pervasive that a court can reasonably infer that there is no room left for the states to supplement it. *Hughes v. Att'y Gen. of Fla.*, 377 F.3d 1258, 1267 (11th Cir. 2004). The Supreme Court has repeatedly cited *Hines,* supra, for the proposition that an "Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S. Ct. 2114, 2129, 68 L. Ed. 2d 576 (1981); *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157, 98 S. Ct. 988, 944, 55 L.Ed 2d 179 (1978); see *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 633, 93 S. Ct. 1854, 1859, 36 L. Ed. 2d 547 (1973). Where the federal government has acted in an area of unique federal concern and has crafted a balanced, tailored approach to an issue, and the state law threatens to upset that balance, the state law is preempted. *Natsios*, 181 F.3d at 77.

As was discussed above, the federal government has exclusive control over issues involving foreign affairs and foreign commerce. The State of Florida has entered into that exclusive realm to enact a statute that will allow the state to regulate foreign affairs and foreign commerce. The federal government made clear in the Trading With the Enemy Act and related regulations that it intends to occupy the field when it comes to regulating interactions with Cuba. Under *Natsios*, the Trading With the Enemy Act is the prime example of when the government acts "in an area of unique federal concern and has crafted a balanced, tailored approach to an issue."  *Id.*  Because the State of Florida has undertaken to upset that balance through the passage of the Sellers of Travel Act, it is likely that Plaintiffs will be able to prove that the state law is preempted.

### 3. The Federal Foreign Commerce Power

The foreign affairs power is not the only aspect of the Constitution at work in the foreign affairs arena. In addition to the foreign affairs power, the Commerce Clause grants Congress the power to regulate commerce with foreign nations. U.S. CONST. art. 1, § 8, cl. 3. In *Garamendi*, the Supreme Court held that the Foreign Commerce Clause protects the federal government's ability to speak with "one voice" in regulating commerce with other nations. 539 U.S. at 414 (citing *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 449, 99 S. Ct. 1813, 1822, 60 L. Ed. 336 (1979)).

"Absent a compelling justification … a State may not advance its legitimate goals by means that facially discriminate against foreign commerce." *Kraft Gen. Foods, Inc. v. Iowa Dept. of Revenue & Fin.*, 505 U.S. 71, 81, 112 S. Ct. 2365, 2371, 120 L. Ed. 2d 59 (1992).  Like the dormant domestic Commerce Clause, which has the core purpose of preventing states and their political subdivisions from promulgating protectionist policies, the Foreign Commerce Clause restricts protectionist policies, but it also restrains the states from excessive interference in foreign affairs. *Natsios*, 181 F. 3d at 66 (quoting *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 188 (1st Cir. 1999)).

A law need not be designed to further local economic interests to run afoul of the Commerce Clause. *Natsios*, 181 F. 3d at 67. Local favoritism is not an essential element of a violation of the Foreign Commerce Clause, "[a]s the absence of a local benefit does not eliminate the international implications of the discrimination…." *Kraft*, 505 U.S. at 79. Nor does the law's applicability to both foreign and domestic companies save it from being violative of the Foreign Commerce Clause. *Natsios*, 181 F.3d at 67. When the Constitution speaks of foreign commerce, it is not referring only to attempts to regulate the conduct of foreign companies, but also to attempts to restrict the actions of American companies overseas. *Id.* at 68.

The First Circuit in *Natsios* found that the Massachusetts Burma Law was discriminatory against two subsets of foreign commerce: (1) that involving companies or persons organized or operating in Burma and (2) that involving companies or persons doing business with Burma.  *Id.* The law was thus a direct attempt to regulate the flow of foreign commerce.  *Id.* The court specified three reasons why the law violated the Foreign Commerce Clause: (1) although the law

did not discriminate against foreign companies, it did facially discriminate against foreign commerce; (2) the law impeded the federal government's ability to speak with one voice in foreign affairs; and (3) the law amounted to an attempt to regulate conduct outside of Massachusetts and out of this country's borders. *Id.* at 68-69.

When a law is discriminatory on its face against foreign commerce, it can survive Commerce Clause scrutiny only if it is "demonstrably justified" because it "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 274, 278, 108 S. Ct. 1803, 1808, 1810, 100 L. Ed. 2d 302 (1988). Where discrimination is patent, neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown. *Id.* at 276; see also *Bacchus Imps, Ltd. v. Dias*, 468 U.S. 263, 265, 271, 104 S. Ct. 3049, 3052, 3055, 82 L. Ed. 2d 200 (1984); *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 29 42-44, 100 S. Ct. 2009, 2012, 2019; 64 L. Ed 2d 702 (1980).

Here, there is a high likelihood that the Travel Act Amendments violate the Foreign Commerce Clause. Like the Massachusetts Burma Law, the Travel Act Amendments appear to facially discriminate against foreign commerce by imposing much higher bonds and penalties on those companies doing business with any "terrorist state."  It also impedes the federal government's ability to speak with one voice on the issue of foreign affairs because it imposes regulations and sanctions on sellers of travel in addition to the federal regulations, and attempts to regulate conduct outside of the State of Florida and outside the borders of the United States. Therefore, it is highly likely that the Travel Act Amendments will be found to violate the foreign commerce clause on its face.

Additionally, at this stage, I conclude that the Travel Act Amendments do not appear to pass commerce clause scrutiny because there is nothing of record to demonstrate that they are demonstrably justified.  *New Energy Co. of Ind.*, 486 U.S. at 274, 278.  There are already in place federal regulations designed to achieve the government's interest in protecting national security. The Trading With the Enemy Act has been in effect for decades and clearly provides a lesser restrictive alternative than the regulations and sanctions imposed on sellers of travel by

the Travel Act Amendments.  Consequently, it is highly likely that the Plaintiffs will be able to demonstrate that the Florida Sellers of Travel Act is unconstitutional.

### 4. The Interstate Commerce Clause

Federal regulation over travel and exchange between the United States and Cuba is beyond cavil within the power granted to the national government by the commerce clause.  The Commerce Clause, Article I, Section 8 of the U.S. Constitution provides that "Congress shall have the power to … regulate commerce … among the several states…." U.S. Const., art. I, § 8, cl. 3.  Although federal and state powers to regulate commerce may be concurrent, where the power of Congress over interstate and foreign commerce exists, it dominates. *Milk Control Board of Pa. v. Eisenberg Farm Product*s, 306 U.S. 346, 351-52, 59 S. Ct. 528, 530-31, 83 L. Ed. 572 (1939).

Congress' power to regulate interstate commerce may not be limited, qualified, or impeded by state action, *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119, 62 S. Ct. 523, 526, 86 L. Ed. 726 (1942), nor may it be enlarged or diminished by the exercise or nonexercise of state power. *United States v. Darby*, 312 U.S. 100, 114, 61 S. Ct. 451, 457, 85 L.Ed 609 (1941).

The Commerce Clause gives Congress the authority to regulate: (1) the use of channels of interstate commerce; (2) the instrumentalities of interstate commerce, meaning persons or things in interstate commerce; and (3) activities substantially related to interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558-59, 115 S. Ct. 1624, 1629-30, 131 L.Ed 2d 626 (1995); *United States v. Morrison*, 529 U.S. 598, 609, 120 S. Ct. 1740, 1749, 146 L.Ed 2d 658 (2000); *Gonzales v. Raich*, 545 U.S. 1, 16-17, 125 S. Ct. 2195, 2205, 162 L.Ed 2d 1 (2005); *United States v. Ballinger*, 395 F.3d 1218, 1225 (11th Cir. 2005); *United States v. Smith*, 459 F.3d 1276, 1283 (11th Cir. 2006).

Channels of interstate commerce are "interstate transportation routes through which persons and goods move," including "highways, railroads, navigable waters, and airspace." *United States v. Ballinger*, 395 F.3d 1218, 1225-26 (11th Cir. 2005); see *Perez v. United States*, 402 U.S. 146, 150, 91 S. Ct. 1357, 1359, 28 L. Ed. 2d 686 (1971). Courts have consistently

found that airplanes are instrumentalities of interstate commerce. *Ballinger*, 395 F.3d at 1226. Regarding the third area of authority, the Supreme Court has established a four-pronged test for determining whether a regulated activity "substantially affects" interstate commerce, in evaluating a facial challenge to the constitutionality of a federal statute: (1) whether Congress made findings about the activity's impact on interstate commerce; (2) whether the federal statute contains an "express jurisdictional element" limiting the statute's reach; (3) whether the activity is commercial or economic by nature; and (4) whether the connection between the activity and its effect on interstate commerce is attenuated. *Morrison*, 529 U.S. at 610-612.

In a recent Supreme Court case, the Court noted that *Wickard v. Filburn*, 317 U.S. 111 (1942), "establishes that Congress can regulate purely intrastate activity that is not itself 'commercial' …, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Gonzales*, 545 U.S. at 18. The courts "have never required Congress to legislate with scientific exactitude. When Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the entire class." *Id*. at 17. The *Gonzales* Court also noted that a court "need not determine whether [the activities regulated], taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id*. at 22. "'It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole' can survive a Commerce Clause challenge." *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1276 (11th Cir. 2007) (quoting *Hodel v. Ind.*, 452 U.S. 314, 329 n.17, 101 S. Ct. 2376, 2386 n.17, 69 L.Ed 2d 40 (1981))..

Congress has enacted an extensive web of federal laws to regulate business with and travel to Cuba through the passage of laws such as the Trading with the Enemy Act (50 U.S.C. § 5) and regulations promulgated and enforced by the United States Treasury Department, Office of Foreign Assets Control, as well as the Airline Deregulation Act and regulations implemented and enforced by the United States Department of Transportation ("DOT"). Congress has the authority to regulate travel to and business with Cuba under each of the three areas of authority enumerated in *Lopez*, *supra*, and its progeny. Travel to Cuba requires the use

44

of the channels of interstate commerce, particularly navigable waters and airspace. Travel to Cuba requires the use of "instrumentalities of interstate commerce" – particularly, air carriers. Further, travel to Cuba is a regulated activity that is substantially related to interstate commerce, because the federal regulatory and statutory scheme related to travel to Cuba is clearly economic by nature. Therefore, federal laws governing travel to Cuba are properly within Congress's authority to regulate.

### B. Plaintiffs Have Shown Irreparable Harm, Have No Adequate Remedy at Law, and the Threatened Injury Outweighs Whatever Damage the Injunction May Cause

#### 1. The Facts Warrant a Finding of Irreparable Harm

Plaintiffs in this case have demonstrated that they will suffer irreparable harm absent entry of a preliminary injunction. The preponderance of evidence at preliminary injunction establishes that the Plaintiff travel agencies will be forced to close their businesses as they cannot afford the excessive bond under the conditions set by the law. Affidavits of Mario B. Romero at ¶ 9; Jesus Rodriguez at ¶ 9. The attestation of Mario Romero in his Affidavit on behalf of Plaintiff Cojimar Express Services, Inc. ("Cojimar") is illustrative. Cojimar is a small family-run company. Mr. Romero runs the company with his wife. Romero Aff. ¶ 9. Mr. Romero is legally blind, and the company is his and his wife's primary source of income on which they had planned to be able to retire. Romero Aff. ¶ 9.

As Mr. Romero attests, his company is unable to meet the substantially higher bond requirements imposed under the law challenged in this lawsuit, and the bond that the company was previously required to post was only ten thousand dollars and was waived by the state based on the company's clean record and lack of consumer complaints. Romero Aff. ¶ 8. Approximately 90% of the company's business activities involve providing travel related services to Cuba. Romero Aff. ¶ 12. Neither the company nor its owners have the cash available to post $100,000.00 (much less a $250,000.00) bond and as a result they will not be allowed to do business. Mr. Romero has attempted to obtain an insurance company guarantee

of the bond and has been advised by the company's insurer that it will be unable to issue a bond for the amount required by the new law.  Romero Aff. ¶ 11.  As a result, Plaintiff Cojimar will be forced to cease doing business completely on July 1, 2008. Romero Aff. ¶ 12.

The Plaintiff charterers will have their businesses severely disrupted, absent travel agencies to provide them passengers on the charters, and will likely close their businesses if faced with the possibility of third degree felonies and other significant administrative fines and penalties for minor infractions.  Aral Aff. ¶ 6.  As Ms. Aral states in her sworn affidavit, "[m]y company, my employees, and I will live under the immediate threat of criminal prosecution ... if the company violates 'federal law restricting or prohibiting commerce with terrorist states,' including OFAC regulations.  Even minor errors of law may constitute OFAC violations, including allowing even inadvertently, a passenger to take travel with excess luggage or with the wrong license or someone who has traveled more than one time in three years as a Cuban-American visiting relative."  Aral Aff. ¶ 6(a).  Moreover, even if Ms. Aral and the company were willing to live with this unreasonable threat of criminal prosecution for even minor infractions, the economic harm resulting from the Travel Act will cause severe hardship and possibly result in closure of the business.  As Ms. Aral states in her Affidavit, "[b]ecause the legislation does not specify the terms that may limit the exposure under the bond my bonding company has stated it is not willing to provide the bond until the limits of its obligations are established."  Aral Aff. ¶ 6(b).

Further, because the bonding requirements will immediately and irreparably affect the TSPs that sell tickets for flights chartered by ABC, ABC's main source of business will end.  As Ms. Aral states "approximately 90% of ABC Charter's business comes from these 'mom-and-pop' travel agencies.  They are all currently licensed with OFAC and are authorized to do business in the state of Florida.  Virtually all of them are owned by Cuban-Americans, and virtually all of them operate on little capital."  Aral Aff. ¶ 6(c).  As stated in her Affidavit and the Affidavits of the Plaintiff travel agencies (see, e.g., Romero and Rodriguez) these companies will have to cease operations.  If they do not have the resources to post the $100,000.00 minimum bond, as a result and as stated in Ms. Aral's Affidavit, "we will lose more than 70% of

our source of business.  We would then be forced out of business because there is not sufficient business from companies selling travel services outside of Florida to enable us to maintain our revenues."  Aral Aff. ¶ 6(c).

Finally, the new law forces companies providing travel to Cuba to disclose to the state information previously kept confidential by the State and by Plaintiffs regarding customer lists, vendors, and suppliers and other entities with which Plaintiffs do business. Aral Aff. ¶ 6(e).  As a result, this information is now available to the public and will not be treated as confidential by the State of Florida.  This means that Plaintiffs' competitors will have access to information that was previously considered confidential that they will be able to use for their own benefit and to the detriment of the companies that have developed this confidential information for many years, such as Plaintiffs.  Aral Aff. ¶ 6.

### 2. The Serious Harm to Plaintiff's Businesses Constitutes Irreparable Harm Outweighing Whatever Damage the Injunction May Cause

The economic harm faced by Plaintiffs as described in their affidavits constitutes irreparable injury. *Rio Grande Cmty Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005) (threat of substantial loss of business and certainly bankruptcy qualified as a sort of irreparable harm needed to support preliminary injunction.  Court affirmed entry of injunction in favor of a federally qualified health center who sued Puerto Rico's Secretary of Health under § 1983, alleging failure to set up prospective payment systems for reimbursement for services provided to Medicaid patients and that the Secretary failed to make wrap-around payments to make up the difference between what the managed care organizations paid Plaintiff and what Plaintiff was entitled to.  Plaintiff testified he was behind on mortgage payments.)

Moreover, Plaintiffs are not required to demonstrate the complete and imminent destruction of the business to obtain a preliminary injunction.  Irreparable harm means any serious injury that cannot be quantified, i.e., the party suffering the injury cannot be made whole by the payment of monetary damages alone.  Numerous courts have recognized that irreparable harm may result from the loss of a central, key component of the business, even if the business as a whole is not destroyed immediately.  See, e.g., *Galvin v. New York Racing*

*Ass'n, Inc.*, 70 F. Supp. 2d 163, 170 (E.D.N.Y. 1998), aff'd, 166 F.3d 1200 (2d Cir. 1998) (Veterinarian specializing in thoroughbred racehorses granted a preliminary injunction preventing suspension of his state credentials because his practice, although not destroyed, would be "substantially damaged" during the pendency of the lawsuit.  The loss of the business need not be total so long as it is so great as to seriously compromise the company's ability to continue in its current form); *Travelers Int'l AG v. Transworld Airlines, Inc.*, 684 F. Supp. 1206, 1216 (S.D.N.Y. 1988) (Contractor that prepared tour brochures and operated tours for TWA granted preliminary injunction to prevent airline's termination of its contract.  Court found contractor had demonstrated a sufficient threat of irreparable harm resulting from loss of the TWA contract, even if it did a small amount of business exclusive of its relationship with TWA and was attempting to obtain a contract with another airline.  "Even if the Plaintiff did enter into a relationship with [the other airline] there is no evidence that such a combination would be an adequate substitute for the current relationship with TWA."); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (District court entered preliminary injunction in favor of an importer of safes, a shipment of which had been detained by U.S. Customs for alleged trademark violation. Injunction restrained the Defendant from interfering with importation of Plaintiff's safe and ordered Defendant to consent to the release by U.S. Customs of the detained safe.  The Ninth Circuit affirmed, finding a possibility of irreparable harm absent an injunction pointing to evidence that "the importers stood to lose its new found customers and accompanying goodwill and revenue."  "Evidence of threat and loss of prospective customers or goodwill certainly supports a finding of irreparable harm").

### 3. The Threat of Criminal Prosecution of a Third Degree Felony Constitutes Irreparable Harm

The threat of criminal prosecution also constitutes irreparable harm.  *Doe v. Miller,* 216 F.R.D. 462, 471 (S.D. 2003) (threat of irreparable harm requirement for temporary restraining order was satisfied in class action by persons convicted of sex offenses involving minors challenging constitutionality of state criminal statutes prohibiting such offenders from living within 2000 feet or day-care facilities; threatened harm to several representative class members was

enormous including prospect of criminal prosecution, as well as economic loss. "Class members will face criminal prosecution for exercising for what they believe is their constitutional right to live in privacy with their families as they so choose"); *Edgar v. MITE Corp.*, 457 U.S. 624, 651, 102 S.Ct. 2629, 2645, 73 L. Ed. 2d 269 (1982) (concurrence by Justice Stevens in majority opinion invalidating Illinois business takeover act as preempted by federal law and conflicting with the commerce clause, in part because "[a]n individual who is imminently threatened with prosecution for conduct that he believes is constitutionally protected should not be forced to act his peril," because of the possibility that the state intended to enforce the law against the petitioner civilly and criminally).

As set forth in the affidavit of Tessie Aral, even if a company has the financial ability to meet the new, higher bond requirements under the new Travel Act, the owners and operators may be criminally prosecuted for a felony in the event there is even a *de minimis* violation of this law, or any federal law.  Because of the number of federal regulations governing Plaintiffs' conduct, the likelihood of minor violations of federal law is constant and unpredictable.  While under the federal scheme as currently enforced most of these violations result in investigation and progressive enforcement including warning letters, and cease and desist notices, under the Travel Act, Plaintiffs would be subject to these federal penalties, (albeit these are graduated and relatively conservative in nature) but also now would run the risk of being prosecuted as felons under state law.

### 4. Plaintiffs have established Irreparable Harm and an Inadequate Remedy at Law as the Eleventh Amendment Bars a Claim for Damages against the State.

In cases where the defendant is immune from a claim for damages such as claims against the state barred by Eleventh Amendment immunity, irreparable harm is presumed. See, e.g., *Clarke Constr. Co. Inc. v. Pena*, 930 F. Supp. 1470, 1479-80 (M.D. Ala. 1996) (Eleventh Amendment bar to recovery of damages against state established that contractor that was the original low bidder lacked adequate remedy at law for any impropriety in re-bidding of

highway project, as was required for contractor to be entitled for to seek equitable relief of injunction); *Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991) (Eleventh Amendment bar to an award of retroactive damages against the commonwealth clearly establishes that any legal remedy is unavailable and that the only relief available is equitable in nature.); *Am. Fin. Servs Ass'n v. Burke*, 169 F. Supp. 2d 62, 70 (D. Conn. 2001) (Where pecuniary losses cannot later be recovered because the defendant enjoys Eleventh Amendment immunity, such losses are irreparable for purposes of preliminary injunctive relief); *D.A.B.E., Inc. v. Toledo-Lucas County Bd. of Health*, 2001 WL 1916730 (N.D. Ohio, Jul. 6, 2001) ("Because the defendants [are] undoubtedly immune as governmental agencies from an action for damages the absence of such remedy [appears to arise] to the level of irreparable injury").

In the case at bar, Plaintiffs face serious economic harm as a result of the Travel Act Amendments and cannot sue the state of Florida for damages. Therefore, this harm is irreparable as a matter of law.  See, e.g., *Clarke Construction Co. Inc.*, 930 F.Supp. at 1490; *Temple Univ.*, 941 F.2d at 214; *Am. Fin. Servs Ass'n*, 169 F.Supp.2d at 70; *D.A.B.E., Inc.*, 2001 WL 1916730 at *4.


### C. The Injunction Is Not Adverse to Public Interest

It would be in the public's interest to enter a preliminary injunction enjoining the effectiveness and/or enforcement of the Travel Act Amendments.  "The public has an interest in determining the constitutionality" of a challenged state or local ordinance or statute.  *Lozano v. City of Hazleton*, 496 F. Supp. 2d 477, 512 (M.D. Pa. 2007). Moreover, issuing an injunction will mean that the traveling public will continue to be able to make reservations, purchase tickets, and fly to Cuba to visit relatives, conduct research, engage in humanitarian efforts, or otherwise lawfully visit that country under federal law. If the injunction is not issued, travel to Cuba will be severely disrupted (if not wholly stopped) and persons already in Cuba may be stranded there indefinitely.

In contrast, there is no harm to the State, purportedly representing the public, if an injunction is issued.  The public is currently protected by existing state law as well as by the restrictions and protections (including bond requirements) of federal law.  There is no evidence of any need for additional regulation of Plaintiffs and companies providing travel related services to Cuba.  Indeed, many of these companies have had the minimal bond currently required under state law waived because of the dearth of customer complaints and lack of problems with their businesses.  See, e.g., Affidavits of Rodriguez and Romero.

With a preliminary injunction, the only hardship to the Defendant will be a return to the status quo before the Travel Act took effect.  Defendants have not shown that the *status quo ante* has presented a problem or injured anyone.  In contrast, Plaintiffs and their passengers will be irreparably harmed if the Travel Act is allowed to take effect.. See *Hughes v. Christofane*, 486 F.Supp. 541, 546 (D. Md. 1980) (Owner of restaurant brought action to enjoin enforcement of town ordinance prohibiting topless dancing in establishments serving alcoholic beverages or food.  Court held that owners were entitled to TRO enjoining enforcement of the ordinance because the restaurant owners established irreparable harm to their financial interests and their interest in free exercise of constitutional rights.  Enjoining enforcement of ordinance would not substantially harm public interest).

## VIII.  MOTION FOR PROTECTIVE ORDER

The Florida House of Representatives, a non-party, filed a Motion for Protective Order to quash the subpoenas issued to House Speaker Marco Rubio and Representative David Rivera.  Plaintiffs seek to depose the two Representatives, and they also seek the production of certain documents[31].  On August 6, 2008, Plaintiffs served subpoenas on Speaker Rubio and Representative Rivera, directing them to appear for depositions.  In response to the House's Motion for Protective Order, Plaintiffs argue that the testimony of Speaker Rubio and Representative Rivera is relevant to two of their claims:  the claims for violations of the Equal

---

[31] With respect to the documents, the House represents that they have provided all the documents requested by Plaintiffs and that they are not asserting any privilege to any documents at this time.

Protection Clause and the Due Process Clause.  Specifically, Plaintiffs argue that the depositions are necessary to gather evidence on any discriminatory intent or animus behind the passage of the Travel Act Amendments, a necessary element for Plaintiff's Equal Protection Clause. Plaintiffs further contend that based on public statements made by Speaker Rubio and Representative Rivera about the intent and purpose of the Travel Act Amendments, the depositions can lead to the discovery of admissible evidence.  The House makes two central arguments in its Motion for Protective Order, first, that legislative immunity under Federal common law attaches to state legislators and prevents inquiry into the motivations behind their legislative acts, and second, that any testimony offered by Speaker Rubio and Representative Rivera would be irrelevant as to the intent of the Legislature.

Previously, I had granted the Motion for Protective Order without prejudice, and continued the protective order until the hearing on the Motion for Preliminary Injunction in order to determine whether the circumstances of this case warrant the depositions of Speaker Rubio and Representative Rivera to proceed.  On matters submitted to date, I find no basis for the deposition of Speaker Rubio. If the Plaintiffs desire to renew their request to depose Representative Rivera, they may do so by motion, and shall further specify the areas of inquiry and the need for the deposition given the discovery already obtained to date through document production.

## IX. <u>CONCLUSION</u>

The purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L. Ed.2d 175 (1981); *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 573 (5th Cir.1974). Given this limited purpose, a party "is not required to prove his case in full at a preliminary-injunction hearing" and the "findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Id*.

Based on my review of the record, I conclude there is a substantial likelihood that the Travel Act Amendments will be found unconstitutional under the Federal Foreign Affairs powers, the Supremacy Clause, the Foreign Commerce Clause and the Interstate Commerce Clause.

It is therefore,

**ORDERED AND ADJUDGED** that the Defendant, Charles H. Bronson, in his official capacity as the Commissioner of the Florida Department of Agriculture and Consumer Services, and all other officials of the State of Florida under his direction and control, or to whom his powers and obligations may be transferred, shall be, and are hereby, enjoined from implementing and enforcing the amendments to the Florida Sellers of Travel Act, Florida Statutes, Chapter 559, enacted as SB 1310 ("An Act Relating to Sellers of Travel") against the named Plaintiffs to this action and as against other such companies engaged in Cuba related travel. Furthermore, I conclude that no bond is necessary or appropriate as a condition of this Preliminary Injunction.

**ORDERED** this 1st day of October, 2008.

THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc. U.S. Magistrate Judge Chris M. McAliley

Counsel of record